**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**FORT MYERS DIVISION**

| | | |
|---|---|---|
| **KENNETH LEHMAN and SHELIA JOHNSON,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:08-cv-357-FtM-29DNF** |
| | ) | |
| **DON HUNTER, Collier County Sheriff, in** | ) | **Judge Thomas A. Wiseman, Jr.** |
| **his official and individual capacities,** | ) | |
| **JOSEPH ELLIS, Collier County Deputy,** | ) | |
| **individually, and BRIAN SAWYER,** | ) | |
| **Collier County Deputy, individually,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs Kenneth Lehman and Shelia Johnson (collectively, "Plaintiffs") bring this action against defendants Collier County Sheriff Don Hunter and Collier County Deputies Joseph Ellis and Brian Sawyer (collectively, "Defendants") under 42 U.S.C. § 1983, asserting violations of their constitutional rights committed under color of state law. Plaintiffs bring suit against Sheriff Hunter in his official capacity on the grounds of an alleged official policy or custom adopted by the Collier County Sheriff's Office that gave rise to the alleged constitutional violations at issue.[1] They seek damages as well as equitable relief against Deputies Ellis and Sawyer based on the allegedly unreasonable detention, seizure and search of the plaintiffs and their vehicle in the early morning hours of June 3, 2006.

Presently before the Court is Defendants' joint Motion for Summary Judgment in which they assert that there are no material issues of disputed fact and they are entitled to judgment in their favor as a matter of law. Specifically, Defendants assert that there is no evidence that they violated Plaintiffs' constitutional rights and they are entitled to qualified immunity as to Plaintiffs' claims. As discussed below, the Court finds that the Defendants are entitled to judgment in their favor. The motion will therefore be granted and this matter dismissed in its entirety.

**I.      STANDARD OF REVIEW**

The applicable standard for reviewing a summary judgment motion is unambiguously stated in Rule 56(c) of the Federal Rules of Civil Procedure:

---

[1] The claims against Sheriff Hunter in his individual capacity have already been dismissed pursuant to the Order entered July 9, 2008 (Doc. No. 31).

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment may be entered only where there is no genuine issue of material fact. *Twiss v. Kury*, 25 F.3d 1551, 1554 (11th Cir. 1994). The moving party has the burden of meeting this exacting standard. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970), *superseded on other grounds by Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). An issue is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.*

In applying this standard, the district court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Id.* However, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## II.    FACTUAL BACKGROUND

The pertinent facts are undisputed for purposes of the summary judgment motion, unless otherwise indicated.

On June 3, 2006 at approximately 12:56 a.m., the Collier County Sheriff's Office received a 911 call from Tammy Caraway, night manager at a Wal-Mart store on the north side of Naples, Florida, reporting that an irate customer, later identified as plaintiff Lehman, was at the front of the store "yelling obscenities [and] threatening customers." (Doc. No. 48-2, at 1 (CAD Detail Report, Incident # LS0060603262449) ("Initial CAD Report").) Caraway described the customer as a white male in his late forties wearing a white tank top, jeans, and very blonde short hair. (*Id.*) The Initial CAD Report indicates that the irate customer, Lehman, walked out of the store around 12:57.

Plaintiffs attempt to create a disputed issue of fact as to whether Caraway actually told the 911 Operator the customer in question was threatening customers by pointing to Caraway's testimony in which she stated she did not remember Lehman making any threats at all. (Doc. No. 48-2, at 2 (11/6/08 Dep. of T. Caraway ("Caraway Dep.") at 19:6).) In fact, although Caraway did not recall hearing Lehman make any specific threats, it nonetheless appears she reported to the 911 dispatcher that the customer was threatening others, based on the Initial CAD Report as well as what the defendant deputies heard broadcast on their police radios. Caraway testified that she noticed Plaintiffs shortly after they entered the store because, as the couple started walking down the main aisle of the store, the man later identified as Lehman began "swearing and cussing and screaming that he hated Wal-Mart." (Caraway Dep. 9:1-3.) Caraway ignored him at that point because she did not want problems. Shortly thereafter, however, Lehman and Johnson exited the store, just behind a small group of young men in their early twenties. A couple of minutes later, according to Caraway, the young men ran back into the store "saying he had a gun."[2] (Caraway Dep. at 12:13.) Caraway described the men as "quite upset and they weren't going back outside," and "[t]hey were upset, they were afraid to go back out." (Caraway Dep. at 12:21–22; 13:1–2.) Caraway told them to stay there and she would call the police, which she did.[3]

Caraway's recollection of events after that point was vague; she recalled primarily that Lehman re-entered the store at some point and was still loud and cursing. (Caraway Dep. at 13:23–14:25.) According to the Initial CAD Report, Caraway advised the 911 operator at 12:57 that she had seen the man leaving the store parking area in a Burgundy Mustang with black ragtop. (Doc. No. 48-2, at 1.) She also advised the operator that, on behalf of the Wal-Mart store, she did not want the man to be allowed to return to the premises. She authorized the Sheriff's Office to issue Lehman a trespass warning not to return to the store. (Initial CAD Detail Report; Caraway Dep. at 16:9–17:2; 25:1—12.)

---

[2] Plaintiffs assert that Caraway's report that the young men told her Lehman had a gun was hearsay. That assertion is beside the point given that Lehman admits he had a gun, so the statement was irrefutably true. Even if it were not true, the question at that point was whether Caraway's report to the police was sufficient to give rise to a reasonable suspicion on the part of the police that Lehman had a gun.

[3] Plaintiffs' assertion that "Tammy Caraway's unqualified opinion about how she felt that the [other customers] felt is irrelevant to this case" (Doc. No. 50, at 2) is simply incorrect. It is relevant insofar as Caraway apparently conveyed to the police operator that an irate customer had been yelling and threatening other customers, giving rise to a reasonable suspicion on the part of the police that the irate customer, Lehman, had in fact been threatening other customers.

Based upon the information received from Tammy Caraway, the Collier County Sheriff's Office issued a "BOLO" ("Be On the Look Out") for a burgundy convertible Mustang in the vicinity of the north Naples Wal-Mart, driven by a white male who appeared to be in his late forties with very short blond hair, who had just disturbed the peace and threatened customers at the Wal-Mart store. (*See* Doc. No. 48-4, at 18 (Ellis's 11/4/08 Ans. to Pls.' Interrog. No. 7; Doc. No. 48-5, at 18 (Sawyer's 11/3/08 Ans. to Pls.' Interrog. No. 7).)[4]

Approximately fifteen minutes later, around 1:15 a.m. on June 3, 2006, Sgt. Joseph Ellis of the Collier County Sheriff's Office, while on patrol in a marked police car, observed a red convertible Ford Mustang approximately four to five miles from the Wal-Mart but on the same road as the Wal-Mart, driven by a white male who appeared to be in his late forties with short blond hair. Sgt. Ellis effectuated a traffic stop of the vehicle in order to further the investigation into the Wal-Mart incident. (Doc. No. 48-2, at 30 (CAD Detail Report, Incident #LS0060603262463 ("Second CAD Report")); Ellis's 11/4/08 Ans. to Pls.' Interrog. No. 7.)[5] Detective Brian Sawyer, also of the Collier County Sheriff's Office, was likewise on routine patrol in the early morning hours of June 3, 2006. Detective Sawyer responded to the traffic stop almost immediately and acted as back-up for Sgt. Ellis. (Sawyer's 11/3/08 Ans. to Pls.' Interrog. No. 7).

---

[4] Plaintiffs attempt to dispute this fact by pointing out that Caraway clearly testified that Lehman peaceably left the premises and was not trespassing while he was on the premises. In fact, the Defendants have not alleged that Lehman was trespassing, and the question of whether he was trespassing does not appear to have any relevance to the case. (Ellis's 11/4/08 Ans. to Pls.' Interrog. No. 10.) Plaintiffs nonetheless seem to be suggesting that because no trespass was committed, the police had no basis for continuing an investigation into the alleged incident at Wal-Mart. Plaintiffs apparently misapprehend the nature of the Trespass Warning, the purpose of which is to give notice that the person to whom it is issued will be considered to trespass if he returns to the property that is the subject of the notice. *See* Fla. Stat. Ann. § 810.0. In addition, Plaintiffs misapprehend the nature of the traffic stop, the purpose of which was to continue the investigation into the Wal-Mart incident in which Lehman was alleged to have threatened other customers of the store.

[5] Plaintiffs assert, with no factual support whatsoever, that "no BOLO alert was ever issued," and then proceed to argue that the BOLO was issued based on statements made by Caraway, yet Caraway never reported any threats made by Lehman. As set forth above, Caraway apparently reported to the 911 Operator that an irate customer had a gun and had behaved in a threatening manner to other customers. The facts to which Plaintiffs point in support of their assertion that no BOLO was issued—that no license plate number was reported, that Caraway erroneously reported the color of Plaintiffs' car as burgundy when it was actually red, and that Caraway described Lehman as "very blond" when he actually had gray hair—simply have no bearing on the question of whether a BOLO was in fact issued or as to whether Deputies Ellis and Sawyer were justified in conducting a brief investigatory stop of Plaintiffs' vehicle when they did. The legitimacy of the stop is a legal issue considered in the Legal Analysis portion of this Memorandum Opinion.

At the time of the traffic stop, the incident at Wal-Mart was still under investigation.[6]  Defendants therefore contend that making the traffic stop was a reasonably necessary step in the investigation into that incident and was taken for the purpose of possibly identifying and apprehending the suspect who had been making threats.  As soon as Ellis approached Lehman after he had pulled him over, Lehman disclosed that he had a gun in his vehicle with a concealed weapon permit.  (Doc. No. 48-6 (9/9/08 Dep. of K. Lehman ("Lehman Dep."), at 30–31).)  He was asked to hand over the weapon, his concealed weapon permit, his driver's license and his proof of insurance, and to step out of the vehicle.  Once outside his car he was handcuffed with his hands behind his back and subjected to a pat-down search.  According to the complaint, Lehman also consented to a search of the car.  After that, Lehman contends the traffic stop was "closed out" but he continued to be detained outside his car while Ellis and Sawyer both questioned him about what had happened at the Wal-Mart.

Sawyer had asked him upon his arrival on the scene whether Lehman had been involved in an incident that occurred at the Wal-Mart, and Lehman acknowledged that he had been but denied that he had been threatening anyone at the Wal-Mart.  Lehman related in detail his side of what had occurred at the Wal-Mart.  According to his own testimony, Lehman was in handcuffs approximately ten to twelve minutes before being released.  After the handcuffs were removed, Ellis issued Lehman a Trespass Warning and allowed him to leave.  (Lehman Dep. at 32:3–35:3.)  The Trespass Warning was issued pursuant to Florida Statute § 810.09, at Tammy Caraway's express authorization on behalf of Wal-Mart, officially warning Lehman that he was not to return to the Wal-Mart or he could be arrested for trespass.  (Initial CAD Report: Ellis's 11/4/08 Ans. to Pls.' Interrog. No. 10; Caraway Dep. at 16:9–17:2.)

 At no time did Detective Sawyer strike or even touch Lehman.  As Lehman concedes, Ellis was the deputy who detained him, and Sawyer basically acted as a back-up observer.  (Lehman Dep. at 30–36.)  Sawyer's participation consisted of asking Johnson if she had any drugs on her, to which she responded in the negative, and voluntarily showed him her purse.  Neither police officer ever searched or

---

[6]  Plaintiffs also assert, likewise with no factual support, that there was no continuing investigation.  Ellis and Sawyer both apparently heard the BOLO, however, and the existence of an ongoing investigation is further supported by the Initial CAD Report, which indicates the incident report remained open until 1:40:05 a.m., when the Trespass Warning was issued at the close of the traffic stop.  The Report describes the incident as a "Disturbance" and the resolution as "Peace Restored," and indicates it was handled in a "routine manner."  (Initial CAD Report, Doc. No. 48-2, at 1.)  The fact that Ellis and Sawyer did not initially go to the Wal-Mart to investigate, particularly given that they knew the suspect, Lehman, had already left the scene, is of no import.

touched plaintiff Shelia Johnson. She remained in the passenger seat of the vehicle during the entire investigation. (Doc. No. 48-3 (9/9/09 Dep. of S. Johnson ("Johnson Dep.")) at 25:6–27:6; *see* Lehman Dep. at 34:18 (acknowledging Sawyer "peeked in" Johnson's purse).)

Plaintiffs Lehman and Johnson were detained for a total of no more than twenty-five minutes— from 1:15 a.m. until the Trespass Warning was issued and the investigation into the Wal-Mart incident was closed at 1:40 a.m.

There is no evidence in the record regarding Sheriff Don Hunter's training and supervision of the deputies under his supervision. (Lehman Dep. at 37–39; Johnson Dep. at 28–29.)

## III.    LEGAL ANALYSIS

### A.    Plaintiffs' Official-Capacity Claim Against Don Hunter, Collier County Sheriff

A suit against a government official in his representative capacity is effectively a suit against the governmental entity of which the official is a representative. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Monell v. New York City*, 436 U.S. 658, 690 n.55 (1978). Consequently, the official-capacity claims against Don Hunter, Collier County Sheriff, are construed as claims against the county itself. However, under § 1983, a governmental entity may not be held vicariously liable under a theory of *respondeat superior*; instead it may only be held liable when its "official policy" causes a constitutional violation. *Monell*, 436 U.S. 658, 694 (1978). Plaintiffs can establish the requisite "official policy" in one of two ways: (1) by identifying an officially promulgated policy, or (2) by identifying an unofficial custom or practice shown through the repeated acts of the final policymaker of the entity. *Grech v. Clayton County, Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). Plaintiffs bear the burden of identifying the policy or custom which caused their injuries so that liability will not be based upon an isolated incident, *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (citations omitted), and the policy or custom must be the moving force behind the constitutional violation. *Grech*, 335 F.3d at 1330 (citations omitted). *See also Board of County Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997) ("Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." (citing *Monell*, 436 U.S. at 694)); *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) ("There is no *respondeat superior* liability making a municipality liable for the wrongful actions of its police officers in making a false arrest.

Instead, a municipality may be held liable for the actions of a police officer only when municipal 'official policy' causes a constitutional violation." (citations omitted)). Random acts or isolated incidents are generally insufficient to establish a custom or practice. *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986).

The present record before the Court is devoid of evidence of any officially promulgated or unofficial custom or practice of the Collier County Sheriff's Office, much less a policy or custom that has any causal connection to the Plaintiffs' alleged injuries. There is no evidence regarding any deficiencies in the training the County offers to or requires of its police officers. Plaintiffs concede that they are "unskilled at obtaining negative information about [the Collier County Sheriff's Office] from [the Collier County Sheriff's Office]," and argue only that the two CAD Detail Reports in the record "detail constitutional violations" and therefore are evidence from which " [a] reasonable person could determine that a Deputy that handled two separate incidents in a routine manner did so according to an established policy, a standard procedure or custom of [the Collier County Sheriff's Office]." (Doc. No. 50, at 9, 11.) Plaintiffs have not identified what that policy might be, indicated how it led to the alleged constitutional violations, nor shown how the CAD Detail Reports themselves contain evidence of constitutional violations. Their official-capacity claims against Sheriff Hunter are therefore subject to summary judgment.

**B.      Plaintiffs' Claims against Ellis and Sawyer**

Plaintiffs sue Ellis and Sawyer in their individual capacity in Counts II and III of the Complaint for violation of the Plaintiffs' rights under the Fourth Amendment to be free from unreasonable detention, search and seizure. Ellis and Sawyer, in their Motion for Summary Judgment, assert the defense of qualified immunity.

*(1)      The Qualified-Immunity Standard*

Qualified immunity protects government actors performing discretionary functions from being sued in their individual capacities. *See Wilson v. Layne*, 526 U.S. 603, 609 (1999). The doctrine shields government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The Eleventh Circuit has recognized that "qualified immunity liberates government

agents from the need to constantly err on the side of caution by protecting them both from liability 'and the other burdens of litigation, including discovery.' " *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir. 2003) (quoting *Lambert v. Fulton County*, 253 F.3d 588, 596 (11th Cir. 2001)). At the same time, qualified immunity does not offer protection "if an official 'knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].' " *Harlow*, 457 U.S. at 815 (quoting *Wood v. Strickland*, 420 U.S. 308, 322 (1975)) (emphasis omitted).

To receive qualified immunity the public official "must first prove that 'he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.' " *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991)). It is uncontested that Deputies Ellis and Sawyer were acting within their discretionary authority on the morning in question.

From there, qualified immunity analysis proceeds in two steps. *Chesser v. Sparks*, 248 F.3d 1117, 1122 (11th Cir. 2001). First, the Court must address the "threshold question" of whether the facts as alleged, viewed in the light most favorable to Plaintiffs, establish a constitutional violation at all. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no constitutional violation is established, then the defendants prevail, and "there is no necessity for further inquiries concerning qualified immunity." *Id.* If, however, under the plaintiffs' version of facts it appears a constitutional right has been violated, the Court must then determine whether that right was clearly established at the time the events in question occurred. *Id.* Defendants here argue first that there is no evidence that they committed a constitutional violation. Alternatively, they contend that if they did, the constitutional right in question was not clearly established.

### *(2)* *Whether a Constitutional Violation Occurred*

The question posed is whether the initial stop of the Plaintiffs' vehicle, or their subsequent detention for a period of almost twenty-five minutes during which Lehman was handcuffed, violated either Plaintiff's constitutional rights. The Court concludes that it did not.

The Fourth Amendment provides for the right to be free of unreasonable searches and seizures, and mandates that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation."

U.S. Const. amend. IV.  The Fourth Amendment applies to the states via the Fourteenth Amendment. *United States v. Davis*, 313 F.3d 1300, 1302 (11th Cir. 2002).  The Supreme Court has established that police officers may conduct warrantless investigatory searches without violating the Fourth Amendment where there is a reasonable suspicion of criminal wrongdoing.  *Terry v. Ohio*, 392 U.S. 1, 30 (1964).  This includes the right to stop a moving vehicle.  *United States v. Hensley*, 469 U.S. 221, 226 (1984). Reasonable suspicion is a somewhat abstract standard that "is not readily, or even usefully, reduced to a neat set of legal rules."  *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal citation and quotation marks omitted).  "While 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Reasonable suspicion need not be based on an officer's personal observations, but rather may be based on information supplied by another person, so long as the information bears sufficient indicia of reliability.  *Adams v. Williams*, 407 U.S. 143, 147 (1972).

Moreover, in the context of the Fourth Amendment, when a defendant raises the defense of qualified immunity, the standard is not actual reasonable suspicion, but "arguable" reasonable suspicion. *Jackson v. Sauls*, 206 F.3d 1156, 1166 (11th Cir. 2000).  Under the qualified immunity inquiry, the issue for determining whether the plaintiff has alleged a Fourth Amendment violation is whether an objectively reasonable officer in the same circumstances and possessing the same information as the defendant could have believed that reasonable suspicion existed.  *See Crosby v. Monroe County*, 394 F.3d 1328, 1332 (11th Cir. 2004) (arguable probable cause exists "if, under all of the facts and circumstances, an officer reasonably could—not necessarily would—have believed that probable cause was present" (citation omitted)); *Jackson*, 206 F.3d at 1165–66 ("A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity.").

Here, the defendant police officers clearly meet the standard required to justify a *Terry* stop. First, the Court notes that Tammy Caraway is appropriately classified as a "citizen informant," whose information is considered to be highly reliable.  *See State v. Maynard*, 783 S.2d 226, 230 (Fla. 2001) (stating that a citizen-informant, as opposed to a paid informant or an anonymous informant, is one who is

fully identified and who is "motivated not by pecuniary gain, but by the desire to further justice." (citations and internal quotation marks omitted)).

Second, the information provided to 911 dispatcher by Caraway, and subsequently communicated by radio-dispatched BOLO to Ellis and Sawyer contained information that gave rise, at a very minimum, to "arguable" reasonable suspicion that the person described by Caraway had committed a crime by threatening other customers at Wal-Mart. Specifically, the crime of "assault" is defined by Florida statute as an "intentional, unlawful threat by word or act to do violence to the person of another, coupled with an apparent ability to do so, and doing some act which creates a well-founded fear in such other person that such violence is imminent." Fla. Stat. Ann. § 784.011(1). The statute further classifies assault as a second degree misdemeanor. Fla. Stat. Ann. § 784.011(2). The information provided by Caraway was also sufficient to give rise to at least arguable reasonable suspicion that the irate customer at the Wal-Mart had committed the offense of disorderly conduct, also prohibited by Florida statute:

> Whoever commits such acts as are of a nature to corrupt the public morals, or outrage the sense of public decency, or affect the peace and quiet of persons who may witness them, or engages in brawling or fighting, or engages in such conduct as to constitute a breach of the peace or disorderly conduct, shall be guilty of a misdemeanor of the second degree[.]

Fla. Stat. Ann. § 877.03.

In other words, the reliability of Caraway's report combined with the content of the report on the 911 call provided Defendants with more than a "minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. at 123. Based on the information in their possession, it was reasonable for the officers to conduct a *Terry* stop of Lehman's vehicle for the purpose of swiftly confirming or dispelling a suspicion that its occupant might have been involved in the Wal-Mart incident, given that the vehicle and occupant closely matched the description given by Caraway and were discovered in close physical and temporal proximity to the Wal-Mart. The stop itself therefore did not violate the Plaintiffs' constitutional rights.

The next question is whether the hand-cuffing and detention of Lehman for approximately twenty-five minutes transformed the reasonable *Terry* stop into an unreasonable arrest without probable cause. In that regard, the Eleventh Circuit has observed that "an officer's investigation of a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.' "

*United States v. Boyce*, 351 F.3d 1102, 1106 (11th Cir. 2003) (quoting *Terry*, 88 S. Ct. at 1879). "[W]hen the totality of circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest and probable cause is required." *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1506 (11th Cir. 1986) (citation omitted). In determining whether a seizure is an arrest or merely a stop, the Eleventh Circuit has indicated that courts should consider four non-exclusive factors, including: (1) the law enforcement purposes served by the detention; (2) the diligence with which the police pursued their investigation; (3) the scope and intrusiveness of the detention; and (4) the duration of the detention. *United States v. Acosta*, 363 F.3d 1141, 1146 (11th Cir. 2004) (citations omitted). In analyzing whether law enforcement purposes are served by the detention, courts consider whether the officer detained the defendant to pursue a method of investigation likely to confirm or dispel the officer's suspicions quickly with minimal interference. *Id.* The fact the investigation could have been accomplished by less intrusive means does not automatically render a *Terry* stop unreasonable. *United States v. Sharpe*, 470 U.S. 675, 686–87 (1985). An officer's action in handcuffing a defendant or securing him in a patrol car does not automatically convert a *Terry* stop into an arrest. *Acosta*, 363 F.3d at 1147. The inquiry as to whether the use of a particular restraint converts a stop into an arrest is, again, reasonableness. *United States v. Kapperman*, 764 F.2d 786, 791 n.4 (11th Cir. 1985). Police are permitted to take reasonable action to protect themselves or to maintain the status quo. *Id.*

In the case at bar, Lehman himself admits that he himself immediately informed Ellis that he had a loaded weapon in the vehicle. Lehman also admits that he immediately confirmed the officers' suspicion that he had been involved in the Wal-Mart incident. These confessions, coupled with the dispatcher's report that the man had been irate and acting in a threatening manner, gave Ellis a reasonable basis for placing Lehman in handcuffs and conducting a pat-down search, and for keeping Lehman in handcuffs while he further confirmed whether any offense had been committed. The evidence indicates that Lehman was detained just long enough for Ellis to check his identification, briefly question him, confirm that no offense had been committed—or, in any event, that no one at Wal-Mart wanted to press charges—and to issue a Trespass Warning. Under a "totality-of-the-circumstances" analysis, the Court finds that Ellis was reasonably justified in investigating Lehman's involvement in the Wal-Mart incident; he pursued that objective with reasonable diligence and there is no evidence of unnecessary

delay; the scope and intrusiveness of the detention were not excessive; and the duration of the detention was well within the boundaries of reasonableness. *Cf. Acosta*, 363 F.3d at 1148 ("Thirty minutes duration is not beyond the pale of reasonableness for *Terry* stops, as our prior decisions make clear."). Nor is there any evidence that defendant Sawyer independently took any action that violated either Lehman's or Johnson's rights.

Johnson, for her part, was not subjected to a pat-down search and in fact was not even required to get out of the car. She apparently consented to a brief visual inspection of the contents of her purse. There is no evidence in the record indicating either officer overstepped the bounds of reasonableness with respect to Johnson either.

In sum, Ellis's and Sawyer's actions in stopping and detaining Lehman and Johnson were not unreasonable, and Plaintiffs have not established a violation of a constitutional right. Because no constitutional violation was established, the Court's analysis ends here. Defendants Ellis and Sawyer are entitled to summary judgment and their motion will be granted.

## IV. CONCLUSION

For the reasons set forth herein, the Court finds that there are no genuine issues of material fact and all three defendants are entitled to judgment in their favor as a matter of law. The motion for summary judgment will therefore be granted and this matter dismissed.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge
Sitting by Designation in the Middle District of Florida